UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELEAZAR RAMIREZ,<br><br>　　　　Petitioner,<br><br>　v.<br><br>DAVE DAVEY,<br><br>　　　　Respondent. | No. 1:15-cv-01072-LJO-JLT (HC)<br><br>**FINDINGS AND RECOMMENDATION TO DENY PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION DEADLINE]** |

Petitioner is currently serving an indeterminate sentence of 96 years-to-life for convictions of carjacking, assault with a firearm, possession of a firearm and ammunition by a convicted felon, and evading a police officer. He has filed the instant habeas action claiming juror misconduct and bias. As discussed below, the Court finds that the state court rejection of his claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent and recommends the petition be **DENIED.**

**I.　　PROCEDURAL HISTORY**

On July 8, 2013, in the Fresno County Superior Court, Petitioner was found guilty of: two counts of carjacking (Cal. Penal Code § 215(a)); assault with a firearm (Cal. Penal Code § 245(a)(2)); possession of a firearm by a felon (Cal. Penal Code § 12021(a)(1)); possession of ammunition by a felon (Cal. Penal Code § 12316(b)(1)); and felony evasion of a peace officer (Cal. Vehicle Code § 2800.2(a)). People v. Ramirez, No. F067605, 2015 WL 970198, at *1 (Cal.

Ct. App. Mar. 3, 2015). Special allegations that Petitioner used a gun in the commission of both carjackings and the assault (Cal. Penal Code §§ 12022.53(b), 12022.5(a)) and that Petitioner discharged a firearm during the commission of the offense (Cal. Penal Code § 12022.53(c)) were found true. Id. Special allegations that Petitioner had two prior serious felony convictions pursuant to the California's three strikes law (Cal. Penal Code §§ 667(b)-(i), 1170.12(a)-(d)), qualified for a prior serious felony enhancement (Cal. Penal Code § 667(a)), and qualified for a prior prison term enhancement (Cal. Penal Code § 667.5(b)) were found true. Id.

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"). Id. The appeal was denied in a reasoned opinion on March 3, 2015. Id. He then filed a petition for review in the California Supreme Court, and the petition was denied on June 10, 2015. (LD[1] 4, 5.) Petitioner also filed a habeas petition in the California Supreme Court. (LD 6.)

On July 13, 2015, Petitioner filed a federal petition for writ of habeas corpus in this Court. (Doc. No. 1.) On September 16, 2016, the Court dismissed all but the sixth claim as unexhausted. (Doc. No. 21.) Respondent filed an answer on November 14, 2016. (Doc. No. 23.) Petitioner did not file a traverse.

## II.   FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

*First Carjacking*

On March 3, 2011, [FN2] Lazaro Cantu met Christine Northrup, a friend and coworker, in Fresno's Tower District for an Art Hop event. They then went to a Thai restaurant on Olive Avenue for dinner about 10:00 p.m. The two arrived in separate cars. Cantu drove his mother's car, a 2005 gray Toyota Camry, which was parked in a different location than Northrup's car.

[FN2] Unless otherwise noted, all date references are to the year 2011.

Cantu walked with Northrup back to his car and was placing leftover food in the backseat when Northrup motioned to him that someone was coming toward them. When Cantu looked up, appellant approached him, pointed a gun at Cantu's abdomen, and said he was taking the car. Cantu got scared and reacted by trying to push the gun down and away from his body. Appellant pulled back and struggled

---

[1] "LD" refers to the documents lodged by Respondent with the answer.

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts. Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

2

with Cantu over control of the gun. The two men went up against a fence. Appellant bit Cantu's arm until Cantu let go of the gun. Appellant threw Cantu to the ground, fell to the ground himself, and the two men struggled. Both men had hold of the gun, but Cantu held only the barrel, not the trigger.

Cantu was pushing or holding the gun above his head when he heard it fire a round. With the gun directly in his face, Cantu heard a "snap" sound. Northrup heard a round go off and also heard a bullet spark, or ricochet, off the street. Northrup heard a second "click" noise, but no bullet was fired from the gun. After the misfire, appellant told Cantu something to the effect that it should have been Cantu's head. With the gun pointed at his face, Cantu held up his hands and asked appellant to calm down. Appellant demanded the car keys and told Cantu to toss them over to him. Cantu tossed the keys to appellant, Cantu and Northrup ran away, and appellant drove away in the Camry.

Cantu clearly saw appellant's face because there was a streetlight where he was assaulted. Cantu saw tattoos on appellant, especially one on the left side of appellant's neck.

After looking at a first photo lineup, Cantu did not see appellant in any of the photographs. In a second photo lineup, Cantu was able to identify appellant.

*Second Carjacking*

Jesus Guerrero was at a coin-operated car wash cleaning his 1993 blue/green Honda Civic on March 12. As Guerrero was about to finish, appellant walked up and pointed a gun at Guerrero. Appellant demanded the keys to the Honda. Guerrero told him the keys were in the car. Appellant motioned for Guerrero to leave and then drove away in the Honda. Guerrero was able to identify appellant in a photo lineup because he recognized appellant's eyes.

Guerrero ran to a nearby Carl's Jr. restaurant and had someone call 911. Police Officer Ryan Stockdale responded to the car wash and found a light-colored Toyota Camry that appellant reportedly left at the scene. When Stockdale ran the license plate number of the Camry, he learned it had been stolen in the Cantu carjacking.

Police tracked appellant using Guerrero's cell phone, which was still in the Honda. Officers found the Honda parked, set up a loose surveillance, and waited until appellant got back into the vehicle and started driving it. Officers began to move in on the Honda. When an officer activated his forward solid red light, flashing front lights, and siren, appellant accelerated away rather than pulling over.

Appellant was driving fast and recklessly through town with patrol units in hot pursuit until officers attempted to immobilize the Honda by ramming into it. Although the impact caused the Honda to spin out, appellant again accelerated the car and continued to flee. Appellant eventually drove the Honda into a cul-de-sac and crashed it into a fence. Two officers pursued appellant on foot. Appellant disposed of his gun during the chase but it was later recovered.

Appellant was eventually apprehended. Officers found a gray cloth bag containing seven live rounds of .22–caliber ammunition, a Toyota key and key fob, paperwork from a car dealership with Cantu's name and address on it, and a piece of paper with Cantu's name on it that also had appellant's fingerprint.

3

*Defense*

Officer Lisa Maldonado testified that she assisted in the investigation of the March 3 carjacking. Northrup gave a general account of appellant approaching them, demanding the keys to Cantu's car, and then pulling out a gun and pointing it at Cantu. Northrup told Maldonado that the assailant fired the gun twice and she believed the assailant was trying to scare Cantu into giving up his car keys. Maldonado canvassed the area for shell casings and looked for strike marks on the street where the bullet may have hit, but found nothing.

*Elevator Comment by Juror No. 9*

After the close of evidence, but prior to jury instructions and closing arguments, Juror No. 9 (Juror 9) [FN3] made a comment about defense counsel in the elevator that was heard by a court employee. The court employee sent an e-mail message to the court clerk explaining that she heard a juror say that she "was surprised that they didn't offer up a defense, I hope he didn't pay too much for that." The court conducted a hearing outside the presence of the full jury with Juror 9 to determine what was said and whether Juror 9 could remain impartial.

> [FN3] Juror 9's badge number ended with the numbers "16" and she was also referred to in the hearing as "**16."

The court asked Juror 9 if she recalled a conversation in the elevator earlier in the day referencing the case with remarks about the defense. Juror 9 replied that she was trying to remember being in the elevator and could not recall. The court again asked Juror 9 if she said something about appellant not offering up a defense and her hope that appellant did not pay too much for that. Juror 9 replied, "You know, possibly, but I don't really recall it. It's possible. It sounds kind of—" She also said a man who sat behind her in the jury box was also on the elevator. Juror 9 did not remember if there was another woman on the elevator.

The court asked Juror 9 if she understood that she was not to "consider whether or not the defense has put on any evidence because they have the absolute right to rely on the case as presented by the People. And they are not obligated to put on one witness. You understand that?" Juror 9 replied, "I do."

The court further admonished Juror 9 that she could not "wonder about it. You cannot speculate about it. And interjecting that into your thoughts at this hour where we are ready to go into deliberation mode in a few hours' time or tomorrow morning at the latest is completely inappropriate. It is inappropriate any other time while you're a juror also. Are you able to give us your word that you will only consider the evidence and follow through with my instructions as I direct you and not any other information or thoughts or any other conjecture that you have about this case? Can you do that?" Juror 9 replied, "I will only—yes. I will just consider what was presented and nothing else." When asked if she could be "fair and impartial to both sides and not come to any conclusions until you start deliberating with the other jurors," Juror 9 replied, "I can." Juror 9 reiterated that she did not really recall what she said.

Juror No. 5 (Juror 5) testified that he was in the elevator with jurors talking about a case. The court asked Juror 5 if he remembered a conversation concerning why the defense had not offered a defense and the person speaking making references about hoping defendant did not pay too much for that. Juror 5 responded, "Maybe." When asked if the statement was directed to him, Juror 5 replied that he

4

assumed the statement was directed to him, the discussion could have been about this case, and there were just a couple of words spoken.

The court asked Juror 5 if he understood that as a juror he was under oath to follow the court's instructions and not discuss the case outside the deliberation room. Juror 5 responded, "I haven't." Juror 5 further indicated that he understood he could not discuss the case with other jurors outside of jury deliberations. Juror 5 indicated there was nothing in the conversation in the elevator that would cause him to be less than fair and impartial. Juror 5 indicated that the conversation in the elevator happened only between him and Juror 9. Juror 5 promised not to discuss the hearing with other jurors.

Defense counsel made a motion to replace Juror 9. The e-mail from the court employee to the court's clerk was preserved as an exhibit. The court noted that Juror 5 was using a listening device in court and did not have such a device with him in the elevator because he apparently did not own his listening device. The court noted no other known juror from the instant action was on the elevator. The court found that Juror 9 expressed a desire to continue to serve and to be a fair and impartial juror who would consider only the evidence that was presented. The court noted its admonishment to Juror 9 that she not speculate on subjects not before the jury.

The court further noted that Juror 9's statement and its tone suggested sympathy toward the defense, not animosity. The court denied appellant's motion to replace Juror 9.

Ramirez, 2015 WL 970198, at *1–4.

### III. DISCUSSION

#### A. Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Fresno County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.     Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-406).

In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" Cullen v. Pinholster, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Harrington, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2003) (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. 510, 520 (2003); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's

factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Jeffries, 114 F.3d at 1500; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), *cert.denied*, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C. Review of Claim

Petitioner claims the trial court erred by failing to dismiss Juror No. 9, who had expressed bias and committed misconduct.

*1. State Court Decision*

Petitioner presented this claim on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> Appellant contends that the trial court erred in denying his motion to substitute Juror 9 with an alternate juror. Appellant argues that Juror 9's comments in the elevator showed prejudice and denied him a fair trial. Appellant characterizes Juror 9's testimony as a lie. Appellant reasons that Juror 9's failure to remember what she said during the hearing before the trial court, even though she had made her comments within 24 hours of the hearing, indicates Juror 9's statements that she would follow the court's instructions and be objective lacked credibility.
>
> When a juror, or a jury, violates the trial court's instruction not to discuss the defendant's failure to testify, the juror or jury has committed misconduct. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1425.) Such misconduct gives rise to a presumption of prejudice, which may be rebutted, by a reviewing court's determination upon examining the entire record that there is no substantial likelihood the complaining party suffered actual harm. (*Ibid.*; *People v. Hardy* (1992) 2 Cal.4th 86, 174.) A similar standard is applied to allegations of juror bias. (*People v. Danks* (2004) 32 Cal.4th 269, 303 (*Danks*); *People v. Nesler* (1997) 16 Cal.4th 561, 582–583 (*Nesler*).)

7

We accept the trial court's credibility determinations and findings of historical fact if supported by substantial evidence. (*Danks, supra*, 32 Cal.4th at pp. 303–304; *People v. Mendoza* (2000) 24 Cal.4th 130, 195.) Whether the prejudice arose from juror misconduct is a mixed question of law and fact subject to the appellate court's independent determination. (*Nesler, supra*, 16 Cal.4th at p. 582.)

Juror misconduct during jury deliberations, for instance noting a defendant's failure to testify, is not prejudicial where the alleged improper statement or discussion is not lengthy or significant. The misconduct can be overcome when, in addition, the offending juror is immediately reminded that he or she cannot consider this factor and the discussion ceases. (*People v. Avila* (2009) 46 Cal.4th 680, 727 (*Avila*).) "'Transitory comments of wonderment and curiosity' about a defendant's failure to testify, although technically misconduct, 'are normally innocuous.'" This is particularly so when a comment stands alone without further discussion. (*Ibid.*; see *People v. Hord* (1993) 15 Cal.App.4th 711, 727–728 (*Hord*).)

In *Hord*, several jurors during deliberations discussed why the defendant did not take the witness stand to testify. The foreperson reminded the jury that whether or not the defendant testified had no bearing on his guilt or innocence and was not to be considered in the decisionmaking process. All further discussion on that point stopped. (*Hord, supra,* 15 Cal.App.4th at pp. 721–722.) *Hord* held that there was no prejudice to the defendant under those circumstances and found the discussion to be transitory comments of wonderment and curiosity. (*Id*. at pp. 727–728.)

In analyzing Juror 9's comments in the elevator, we begin with the presumption that the comments constituted misconduct. We next review the record to determine whether the presumption of prejudice was rebutted. In doing so, we give deference to the trial court's factfinding of the historical record.

Appellant contends that Juror 9's credibility was undermined because she appeared not to remember her comments, although they were recently made. Appellant interprets Juror 9's testimony as a lie. We find this interpretation to be unduly harsh. Juror 9 did not deny making a statement in the elevator, admitted it was possible, and stated she could not recall the statement. Juror 9's lack of recollection of her exact statement appeared to show contrition and could be attributed to simple forgetfulness. If Juror 9 was forgetful, her comment was only a casual observation.

The trial court observed Juror 9's demeanor concerning what was said in the elevator and determined that she was being genuine when she promised to follow the court's instructions. The trial court even viewed Juror 9's comments as demonstrating sympathy rather than antagonism for defendant. The trial court could directly evaluate Juror 9's testimony, as well as her demeanor. There are explanations for Juror 9's failure to remember her comments in the elevator besides deception. The trial court could discern sincerity from Juror 9's demeanor. Because we cannot evaluate Juror 9's demeanor from the hearing transcript, we defer to the trial court's factual findings at the conclusion of the hearing.

Furthermore, viewing the entire record, we find on balance that Juror 9's comments were transitory statements of wonderment and curiosity and that she was not harboring a deep-seated prejudice against defendant. We agree with the People's argument that Juror 9's comments do not rise to the level of misconduct of the several jurors in *Hord* who commented on that defendant's failure to testify. Juror 9's comments appear to be in the more benign category of transitory

8

statements of wonderment and curiosity.

Appellant argues that this case is worse than other cases where jury misconduct was held not to be prejudicial or not found to be misconduct. In *People v. Linton* (2013) 56 Cal.4th 1146, 1193–1195, a juror vented to her husband about the case, did not tell him the facts of the case, expressed confusion over something in the case, and told the court her husband did not respond to her comments. The juror told the court that she could be a fair and impartial juror. The defendant in *Linton* posited that the juror was lying. The Supreme Court held that the juror's "venting" to her husband and her confusion did not amount to misconduct. (*Id*. at p. 1195.)

*People v. Loot* (1998) 63 Cal.App.4th 694, 697–698 found it improper for a juror to ask the prosecutor if he was married during an elevator ride, but found the defendant failed to show a "'demonstrable reality'" of the juror's inability to perform the functions of a juror.

In *People v. Stewart* (2004) 33 Cal.4th 425, 509–510, the Supreme Court found misconduct by a juror only trifling. In *Stewart*, the juror complimented the defendant's girlfriend, who was also a witness, for being attractive. We find the facts of this case to be analogous to those in *Linton*, *Loot*, and *Stewart*. We also disagree with appellant that Juror 9's transgressions "far outweighed" those of the jurors in *Linton*, *Loot*, and *Stewart*.

We further find that the trial court carefully admonished Juror 9 (and Juror 5 as well) to be an impartial fact finder, to not speculate about matters not in evidence, and to deliberate with the other jurors. Juror 9 assured the trial court that she could do these things. Again, we must defer to the trial court's evaluation of Juror 9's demeanor and sincerity during the hearing. There is no evidence in the record that this matter came up again or that Juror 9 made any other inappropriate comment or speculation. (*Avila, supra*, 46 Cal.4th at p. 727; *Hord, supra*, 15 Cal.App.4th at pp. 727–728.)

As in *Hord*, the alleged misconduct was corrected by the trial court's admonitions to Juror 9. The misconduct in this case was not as egregious as in *Hord* because it did not occur during deliberations, and only Juror 5 could have heard the comments, although with his hearing difficulties it is more likely that he did not even hear the comments. If Juror 5 did hear Juror 9's comments, the trial court specifically instructed him to disregard them.

The trial court also instructed the jury on defendant's absolute constitutional right not to testify (CALCRIM No. 355), that neither side was required to call witnesses or to produce all the physical evidence that may be relevant (CALCRIM No. 300), and the duty of the jury not to let bias, sympathy, or public opinion influence their decision (CALCRIM No. 200). The trial court's specific admonitions to Juror 9, as well as its specific instructions to the entire jury, were at least as effective, if not more so, as the foreperson's reminder to his fellow jurors in the *Hord* case that they were not to speculate on the defendant's failure to testify at trial. (*Hord, supra*, 15 Cal.App.4th at pp. 727–728.) We conclude that there is no substantial likelihood that appellant suffered prejudice as a result of Juror 9's comments in the elevator.

Ramirez, 2015 WL 970198, at *4–6.

### a. Juror Misconduct

"In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391 U.S. 145 (1968). In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494 F.2d 394, 396 (9th Cir.). Although it is generally preferred that a trial court hold an evidentiary hearing when allegations of juror misconduct arise, it is not always required, particularly when the court knows the exact scope and nature of the misconduct. See United States v. Halbert, 712 F.2d 388, 389 (9th Cir.1983); United States v. Hendrix, 549 F.2d 1225, 1227 (9th Cir.1977); see also United States v. McVeigh, 153 F.3d 1166, 1187 (10th Cir.1998).

The Court is mindful of the fact that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." Rushen v. Spain, 464 U.S. 114, 118 (1983) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). A jury's exposure to "extrinsic evidence" deprives a defendant of the rights to confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment. Lawson v. Borg, 60 F.3d 608, 612 (9th Cir.1995). "Evidence not presented at trial, acquired through out-of-court experiments or otherwise, is deemed 'extrinsic.'" United States v. Navarro–Garcia, 926 F.2d 818, 821 (9th Cir.1991) (citing Marino v. Vasquez, 812 F.2d 499, 504 (9th Cir.1987)). However, when the alleged misconduct is intra-jury, it has been widely held that the trial court is entitled to greater deference in its review, because the misconduct is less serious than extra-jury influences. See Tanner v. United States, 483 U.S. 107, 117- 21 (1987); Smith v. Phillips, 455 U.S. 209 (1982); Remmer v. United States, 347 U.S. 227, 228-30 (1954); Mattox v. United States, 146 U.S. 140, 149 (1892); United States v. Bertoli, 40 F.3d 1384, 1393 (3d Cir.1994) ("[I]ntra-jury communications pose a less serious threat to a defendant's right to an impartial trial than do extra-jury influences, and therefore district courts are entitled to even greater deference in their responses to them than in responses to outside influences."); United States v. Ford, 840 F.2d 460, 465-66 (7th Cir.1988); Government of Virgin Islands v. Gereau, 523 F.2d 140 (3d Cir.1975); Fed.R.Evid. 606(b) (juror may only testify post-verdict on the question whether extraneous influence was brought to bear on jurors).

Petitioner has the burden of showing that internal juror misconduct prejudiced him. See United States v. Dutkel, 192 F.3d 893, 895 (9th Cir.1999).

In this case, the communication was intra-jury and only between Juror #9 and Juror #5. As discussed by the appellate court, Juror #9 had remarked to Juror #5 in an elevator that she "was surprised that they didn't offer up a defense, I hope he didn't pay too much for that." Ramirez, 2015 WL 970198, at *3. It is unclear whether Juror #9 was commenting on the fact that Petitioner did not testify in his own defense or if the juror was merely remarking on the presentation of evidence by the defense. Regardless, it is clear that the comment did not concern extrinsic evidence. Raley v. Ylst, 470 F.3d 792, 803 (9th Cir. 2006). Therefore, although Juror #9 may have violated the trial court's instructions, Petitioner has not shown a violation of his constitutional rights.

Even if the comment was misconduct, Petitioner has not demonstrated that it had a substantial and injurious effect on the verdict. Brecht, 507 U.S. at 623. The comment was not made during deliberations, but casually from one juror to another outside of the presence of the other jurors. The appellate court noted that the juror could not recall her statement in the elevator though she admitted it was possible she made the comment. The court found her admission appeared to show contrition and could be attributed to simple forgetfulness. The court found the comment was only a transitory statement of wonderment and curiosity and did not reflect a deep-seated prejudice against the petitioner. When questioned by the trial court, Juror #9 assured the court she would be an impartial fact finder, would not speculate about matters not in evidence, and would deliberate with the other jurors. The court further admonished Juror #5 to disregard the comment. Thus, the misconduct was addressed and corrected by the trial court. Moreover, the court instructed the jury on Petitioner's absolute right not to testify, that neither side was required to present evidence or call witnesses, and that the jury was not to let bias, sympathy, or public opinion affect its decision. In light of the above, Petitioner fails to demonstrate that the alleged misconduct had any effect on the verdict. Certainly, a fair minded jurist could conclude that the state court rejection of the claim was reasonable.

### b. Juror Bias

As previously noted, the Sixth Amendment guarantees a criminal defendant the right to a trial by "an impartial trier of fact-'a jury capable and willing to decide the case solely on the evidence before it.'" McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). The Ninth Circuit has recognized that to disqualify a juror for cause requires a showing of actual bias or implied bias; that is, "bias in fact, or bias conclusively presumed as a matter of law." United States v. Gonzalez, 214 F.3d 1109, 1111-12 (9th Cir.2000).

The trial judge's exercise of his or her responsibility to be "ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen," Smith, 455 U.S. at 217 n. 7, inherently involves the trial court's "appraisal of witness credibility and demeanor." Thompson v. Keohane, 516 U.S. 99, 111 (1995). In performing that function, the trial judge is best positioned to make decisions regarding credibility and demeanor; hence, the "judgment of the jurist-observer" has been given "presumptive weight" in these matters. Id. Thus, juror impartiality is a factual issue that is within the statutory presumption of correctness. Id.; Wainwright v. Witt, 469 U.S. 412, 429 (1985); Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir. 1990) ("findings of state trial and appellate courts on juror impartiality deserve 'a high measure of deference.'"); see Skilling v. United States, 561 U.S. 358, 386 (2010) ("reviewing courts are properly resistant to second-guessing the trial judge's estimation of a juror's impartiality….").

In this case, the state court determined that Juror #9's comment did not reflect a deep-seated hatred for the petitioner. Rather, the court remarked that "[t]he trial court even viewed Juror #9's comments as demonstrating sympathy rather than antagonism for [him]." Ramirez, 2015 WL 970198, at *5. Her responses to the trial court's questions further showed a lack of bias or prejudice against the petitioner. There is no indication that the juror was actually biased or that the alleged bias had any effect on the verdict. Petitioner fails to show that the state court rejection was unreasonable.

### IV. RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be

DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: **May 31, 2017**  /s/ Jennifer L. Thurston
UNITED STATES MAGISTRATE JUDGE